[Cite as *State v. Lewis*, 2024-Ohio-756.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Appellee | : | C.A. No. 2023-CA-24 |
| v. | : | Trial Court Case No. 2023 CR 011 |
| ANTHONY DION LEWIS | : | (Criminal Appeal from Common Pleas Court) |
| Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on March 1, 2024

. . . . . . . . . . .

COLIN P. COCHRAN, Attorney for Appellant

JANE A. NAPIER, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Defendant-Appellant Anthony Dion Lewis appeals from his conviction for failure to comply with an order or signal of a police officer following a jury trial. For the reasons outlined below, we affirm the judgment of the trial court.

**I.      Factual and Procedural Background**

{¶ 2} On November 18, 2022, Lewis was pulled over while driving a Dodge Dakota

pickup truck by Lieutenant Robert McConnell of the Mechanicsburg Police Department. John Hepburn, who was a passenger in the vehicle, was the registered owner. McConnell initiated the traffic stop because Lewis was not wearing a seatbelt and, upon running the vehicle's license plate, McConnell learned that the owner of the vehicle did not have a valid driver's license. When he approached the vehicle, McConnell asked Lewis and Hepburn for their personal information, and Lewis provided McConnell with his name and Social Security number. McConnell returned to his patrol car, entered Lewis's information into the computer system, and learned that Lewis had a warrant for his arrest because he had been declared a parole violator-at-large. With this information, and because he was alone at the scene, McConnell remained near his patrol car and shouted at Hepburn and Lewis to place their hands out of the window, to toss the keys out the window, and to exit the vehicle. Lewis did not obey McConnell's order and fled the scene, driving recklessly on State Route 29 and exceeding the speed limit. McConnell initially pursued Lewis but ultimately terminated the pursuit after approximately 20 miles because of the danger posed by Lewis's reckless driving.

{¶ 3} In January 2023, Lewis was indicted for one count of failure to comply with an order or signal of a police officer in violation of R.C. 2921.331(B)(C)(5)(a)(ii), a felony of the third degree. At the time of the events leading to the indictment, Lewis was under post-release control supervision from the Franklin County Common Pleas Court for felonious assault and domestic violence, felonies of the second and third degree. On June 6 and 7, 2023, the matter proceeded to a jury trial.

{¶ 4} Hepburn testified that he was a home remodeler and had hired Lewis as a

painter for his business. Hepburn admitted that he was a methamphetamine user and that he occasionally hired workers with criminal records. According to Hepburn, he did not have a valid driver's license but owned the Dodge Dakota truck on the day that "Tony" (Lewis) was driving his truck and was stopped by Lieutenant McConnell. According to Hepburn, when McConnell initiated the traffic stop, he approached the vehicle and asked Hepburn and Lewis for their identification, which they verbally provided. McConnell then returned to his patrol car and, shortly after, he yelled for Hepburn and Lewis to put their hands out the window. At that moment, Lewis drove away, fleeing the scene, and McConnell immediately pursued them. Hepburn claimed that he told Lewis to stop, but Lewis responded that he did not want to go back to jail. Lewis later drove Hepburn to an ATM for him to withdraw money to pay Lewis for his day's work, and Lewis eventually stopped driving the vehicle near a relative's house. Hepburn then exited the vehicle and called the police from a gas station to report that his vehicle had been involved in a high-speed police chase. Hepburn was not charged with any crime. During his testimony, Hepburn identified Lewis as the person seated at the defense table.

{¶ 5} Lieutenant McConnell also testified at Lewis's trial. McConnell stated that he had seen Hepburn's truck pass his stationary location and had observed that the driver of the vehicle was not wearing a seatbelt. McConnell then entered the vehicle registration information into the Law Enforcement Automatic Data System (LEADS) and discovered that the registered owner of the vehicle (Hepburn) did not have a valid driver's license. Before stopping the vehicle, McConnell noticed the passenger, later identified as Hepburn, making furtive movements and suspected that he was trying to hide something.

McConnell did not know if the driver of the vehicle was the registered owner at that time, so he initiated the traffic stop around 4:33 p.m.

{¶ 6} Upon approaching the vehicle and confirming that the driver (Lewis) was driving without a seatbelt, McConnell asked Lewis for his driver's license, which Lewis was not carrying. Lewis then identified himself by name and Social Security number, and McConnell returned to his patrol car with Lewis's personal information and entered it into LEADS. LEADS populated an active arrest warrant and picture for Lewis, and McConnell identified Lewis, with the assistance of an additional more-recent photograph from the Ohio Department of Rehabilitation and Corrections (ODRC) database, as the driver of the vehicle and a violator-at-large with an arrest warrant. Lewis had an opportunity to observe Lewis during the time he was standing outside the driver's side of the vehicle. From the safety of his patrol car, McConnell shouted for Hepburn and Lewis to show their hands, to throw the vehicle keys out the window, and to exit the vehicle. Instead, Lewis drove away. The traffic stop lasted approximately five minutes, ending at around 4:38 p.m.

{¶ 7} McConnell pursued Lewis in a high-speed chase for approximately 15 minutes over 20 miles, but then terminated the pursuit due to safety concerns at around 4:56 p.m. According to McConnell, Hepburn called the police at around 5:38 p.m. to report the high-speed chase involving his vehicle. McConnell testified that, with the assistance of the two photographs, he was 100% certain that Lewis had been the driver of the vehicle.

{¶ 8} The jury found Lewis guilty of the one count of failure to comply with an order

or signal of a police officer. The trial court sentenced Lewis to 36 months in prison, to be served consecutively to any other prison term imposed on Lewis. The court also ordered Lewis to serve an enhanced post-release control term of 12 months (because Lewis had less than one year remaining on his post-release control supervision from the Franklin County Common Pleas Court) and imposed a mandatory driver's license suspension of 18 years. Lewis timely appeals.

## II.        Assignment of Error

{¶ 9} Lewis raises a single assignment of error, claiming his conviction was against the manifest weight of the evidence.

{¶ 10} A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12, citing *State v. Hufnagel*, 2d Dist. Montgomery No. 15563, 1996 WL 501470, *3 (Sept. 6, 1996). The proper test to apply to a manifest weight of the evidence inquiry is set forth in *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983), which states:

> [T]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*Wilson* at ¶ 12-13, citing *Martin* at 175. "In order to find that a manifest miscarriage of justice occurred, an appellate court must conclude that a guilty verdict is 'against,' that is,

contrary to, the manifest weight of the evidence presented." *Id.* at ¶ 14, citing *State v. McDaniel,* 2d. Dist. Montgomery No. 16221, 1998 WL 214606 (May 1, 1998).

**{¶ 11}** The credibility of the witnesses and the weight to be given to their testimony are matters primarily for the trier of fact to resolve. *Id.* at ¶ 15, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). In *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997), we explained:

> Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

*Id.* at *4. Thus, we will not substitute our judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *See Wilson* at ¶ 17, citing *State v. Bradley,* 2d Dist. Champaign No. 1997-CA-3, 1997 WL 691510, *4 (Oct. 24, 1997).

**{¶ 12}** The trier of fact is in the best position to consider inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. *State v. Petty*, 10th Dist. Franklin Nos. 11AP-716, 11AP-766, 2012-Ohio-2989, ¶ 38, citing *State v. Williams*, 10th Dist. Franklin No. 02AP-35, 2002-Ohio-4503, ¶ 58. Consequently, an appellate court must give great deference to the fact finder's

determination of the witnesses' credibility. *Id.* "To that end, the fact finder is free to believe all, part or none of the testimony of each witness appearing before it." *Id.*, citing *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21. "Mere disagreement over the credibility of witnesses is not sufficient reason to reverse a judgment." *Id.*, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24.

**{¶ 13}** Additionally, "[t]he fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61 and 2013-CA-62, 2014-Ohio-3432, ¶ 24. "It is well-established that when conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *In re M.J.C.*, 12th Dist. Butler No. CA2014-05-124, 2015-Ohio-820, ¶ 35.

**{¶ 14}** Lewis first argues that the credibility of Hepburn as a witness was questionable. Lewis points out that Hepburn was a methamphetamine user with a suspended driver's license and that he hired employees with criminal records. According to Lewis, Hepburn provided conflicting testimony as to how he and Lewis parted ways after the car chase, specifically claiming that Hepburn testified that Lewis ("Tony") had abandoned Hepburn in the vehicle while Lewis went to his relative's house, that Lewis had dropped Hepburn off at a gas station, that Hepburn had failed to tell police about the stop at the ATM; and that Hepburn had remained in the vehicle with Lewis for four hours after the car chase before contacting the police. Lewis argues that Hepburn had his own

personal interests to protect and thus had reason to fabricate a story against Lewis to protect himself from criminal charges. Lewis further argues that Hepburn did not know the true identity of the driver of his vehicle, as he only knew the driver as "Tony."

{¶ 15} Lewis also argues that McConnell's testimony was questionable. Lewis contends that the entire traffic stop lasted only five minutes and that most of McConnell's time during the traffic stop was spent in his police cruiser running the plates of the vehicle, initiating the traffic stop, querying LEADS, and issuing surrender commands from the safety of his cruiser. Lewis argues that McConnell's identification of Lewis as the driver of the vehicle rested solely on McConnell's alleged visual observation of the driver during a high-pressure traffic stop in which McConnell was concerned with his own safety. Lewis asserts that McConnell did not get a second look at the driver to confirm his identification of the driver as Lewis.

{¶ 16} We note that the crux of Lewis's defense was that the State had "the wrong guy." However, Lieutenant McConnell testified that, upon stopping the vehicle, the driver, later identified as Lewis, provided his name and Social Security number to McConnell after stating that he did not have his wallet. McConnell then entered Lewis's information into LEADS, which populated an active arrest warrant and picture for Lewis. McConnell ultimately identified Lewis, with the assistance of an additional more-recent photograph from the ODRC database, as the person he had observed as the driver of the vehicle and a violator-at-large with an arrest warrant; McConnell testified that he was 100% certain that Lewis and the driver of the vehicle were the same person. Furthermore, Hepburn, the passenger and owner of the vehicle, corroborated McConnell's identification of Lewis

as the driver by stating that "Tony" had worked for him, had been driving the vehicle at the time of the traffic stop, and was the person seated at the defense table during the trial.

{¶ 17} Lewis did not testify and did not present an alternative version of events. The credibility of witnesses and the weight to be given to their testimonies are matters for the trier of fact primarily to resolve. Here, the jury had the opportunity to see and hear the witnesses and to weigh the evidence; it believed the State's witnesses. Although Lewis argues that Hepburn's and McConnell's testimonies at trial were questionable, we will not substitute our judgment for that of the trier of fact on the issue of witness credibility. Additionally, although Lewis contends that Hepburn provided conflicting testimony as to how he and Lewis parted ways after the car chase, we do not agree. Moreover, a conviction is not against the manifest weight of the evidence simply because conflicting evidence was presented at trial. The jury was free to credit the State's evidence.

{¶ 18} As previously stated, the members of a jury are free to believe all, part, or none of the testimony of each witness appearing before it, and disagreement over the credibility of witnesses is not sufficient reason to reverse a judgment. Upon our review of the entire record, we cannot say that the jury lost its way and created a manifest miscarriage of justice or that Lewis's conviction was against the manifest weight of the evidence presented at trial.

{¶ 19} Lewis's assignment of error is overruled.

### III. Conclusion

{¶ 20} Having overruled Lewis's assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .


EPLEY, P.J. and LEWIS, J., concur.