[Cite as *State v. Shaw*, 2025-Ohio-301.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29961 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 00054/1 |
| | : | |
| DEREK E. SHAW | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 31, 2025

. . . . . . . . . . .

JOHNNA M. SHIA, Attorney for Appellant

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

**{¶ 1}** Defendant-Appellant Derek E. Shaw appeals from his convictions in the Montgomery County Court of Common Pleas after a jury found him guilty of three counts of felonious assault, two counts of felony murder, and one count of discharge of a firearm on or near a prohibited premises. Shaw also appeals from his conviction on a single count of having weapons while under disability, which was tried to the court. In support

of his appeal, Shaw claims that he was prejudiced by the trial court's self-defense jury instruction because the instruction did not refer to the felonious assault count for which he was convicted. Shaw also claims that the jury's rejection of his self-defense claim for his convicted offenses was against the manifest weight of the evidence. In addition, Shaw challenges his conviction for felonious assault on allied offense grounds. Finally, Shaw claims that the trial court erred by imposing consecutive sentences. For the reasons outlined below, we will affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On January 14, 2022, a Montgomery County grand jury returned a 14-count indictment charging Shaw with four counts of felony murder, seven counts of felonious assault, and single counts of tampering with evidence, discharge of a firearm on or near a prohibited premises, and having weapons while under disability. The counts for felony murder, felonious assault, and discharge of a firearm on or near a prohibited premises each included a three-year firearm specification.

{¶ 3} The indicted charges stemmed from allegations that, on the late afternoon of January 4, 2022, Shaw killed Marty "Wooty" Powers and paralyzed Powers's cousin, T.R., by firing multiple gunshots at them during a dispute inside Shaw's Dayton residence. The charges also stemmed from allegations that Shaw subsequently went outside on his front porch and fired a series of gunshots at Darryl Dean while Dean was inside his vehicle. It was further alleged that Shaw shot and killed Dean after Shaw ran off his front porch and fired a second series of gunshots at Dean when Dean exited his vehicle and retreated

across the street. Because no firearms were found at the scene, the indictment also alleged that Shaw tampered with evidence after the shootings. The 14 counts in the indictment are broken down as to each victim as follows:

Marty "Wooty" Powers:

Count 1 – Felony Murder via Felonious Assault/Serious Physical Harm

Count 2 – Felonious Assault/Serious Physical Harm

Count 3 – Felony Murder via Felonious Assault/Deadly Weapon

Count 4 – Felonious Assault/Deadly Weapon

Darryl Dean:

Count 5 – Felonious Assault/Deadly Weapon (gunshots from porch)

Count 6 – Felony Murder via Felonious Assault/Serious Physical Harm

Count 7 – Felonious Assault/Serious Physical Harm (gunshots from grass)

Count 8 – Felony Murder via Felonious Assault/Deadly Weapon

Count 9 – Felonious Assault/Deadly Weapon (gunshots from grass)

Count 12 – Discharge of a Firearm on or Near a Prohibited Premises

T.R.:

Count 10 – Felonious Assault/Serious Physical Harm

Count 11 – Felonious Assault/Deadly Weapon

No Victim:

Count 13 – Tampering with Evidence

Count 14 – Having Weapons While Under Disability

{¶ 4} Shaw pled not guilty to the indicted charges and asserted the affirmative

defense of self-defense for Counts 1 through 12. The matter proceeded to a four-day jury trial on all of the charges, excluding the charge for having weapons while under disability, which was tried to the court. After deliberating, the jury found Shaw not guilty of all the counts related to the shooting of Powers and T.R. The jury also found Shaw not guilty of tampering with evidence. The jury did, however, find Shaw guilty of all the counts related to the shooting of Darryl Dean. Following a bench trial, the trial court found Shaw guilty of having weapons while under disability.

{¶ 5} During trial, the jury heard testimony about a prior altercation that Shaw had had with Dean and Kirshna "Pooh" Wortham just hours before Shaw shot Powers, T.R., and Dean. Wortham testified that she had been living with Powers, Dean, and T.R. during the relevant time period and that Powers had been her best friend and the person who had introduced her to Shaw. Wortham also testified that Powers had been a drug dealer who sold crack cocaine to Shaw. According to Wortham, Shaw had been like family to her. Wortham claimed that she had stayed at Shaw's residence for a period of time when she was homeless.

{¶ 6} Wortham testified that, during the early morning hours of January 4, 2022, T.R. called Dean (the only roommate with a vehicle) to ask if Dean would pick him up from Shaw's residence. Because Dean had been drinking, Wortham offered to drive Dean to pick up T.R. Before leaving, Wortham told Powers where she and Dean were going. In response, Powers instructed Wortham to ask Shaw for some money that Shaw owed him and to retrieve a flat screen television that he had left at Shaw's residence. Wortham did not anticipate there being any problem with her making these requests.

{¶ 7} Wortham testified that when she and Dean arrived at Shaw's residence, everything was fine until she asked Shaw for the money that he owed Powers. According to Wortham, Shaw became hostile, yelled in her face, and told her: "I'll give him his money whenever. I ain't got his money right now, qui[t] asking me for it." Trial Tr. Vol. I, p. 213-214. Wortham testified that she became hostile in response to Shaw's conduct and that she and Shaw got into each other's faces and bickered about the money that Shaw owed Powers. In the midst of arguing with Shaw, Wortham told Dean to grab Powers's television. Wortham claimed that Shaw then attempted to get into her face again, but she pushed him down to the ground. Thereafter, Wortham and Dean unhooked the television and carried it out of the residence along with a bag of stuffed animals that belonged to Wortham. According to Wortham, the altercation with Shaw occurred sometime between 1 a.m. and 2:15 a.m. and lasted no longer than 10 or 15 minutes. Wortham testified that no one had a weapon or referred to a weapon during the altercation.

{¶ 8} Shaw and T.R. testified to similar versions of events; however, Shaw's version included Dean's grabbing him, throwing him on the couch, getting on top of him, and holding him down while Wortham took his television. Shaw also claimed that Dean hurt him by pounding on his chest and neck. Like Wortham and T.R., Shaw testified that no one had a weapon during the altercation.

{¶ 9} Shaw testified that he called 9-1-1 approximately 10 minutes after the altercation with Wortham and Dean to report the theft of his television. When a responding police officer arrived at Shaw's residence, Shaw did not report having been assaulted but only mentioned the theft of his television. A video taken from a body camera worn by the

responding police officer established that Shaw reported a female had entered his residence uninvited, taken his television, and claimed that he owed her money. Shaw told the officer that he did not know the name of the female but admitted that she had been to his residence a few times before the incident. Shaw neither reported that there was another individual with the female nor mentioned any assault or the presence of any weapons. Shaw told the officer multiple times that he simply wanted to make a record of what had happened because if anyone came back, he would be "forced to defend [himself.]" State's Ex. 116.

{¶ 10} Shaw testified that Powers tried to communicate with him on the phone a few hours after the altercation with Wortham and Dean. Shaw, however, refused to speak with Powers. Later that day, Shaw illegally purchased a firearm and some ammunition. Shaw testified that he loaded the firearm and then tucked it into the cushions of a couch in his living room.

{¶ 11} Wortham testified that Powers, T.R., and Dean left their residence in Dean's vehicle at around 4:40 p.m. that same afternoon. Although Powers would not tell Wortham where he and the others were going, Wortham testified that she had a feeling they were going to Shaw's residence. Wortham testified that Powers was carrying a handgun when he left and that Powers seemed anxious and told everyone that he loved them.

{¶ 12} Shaw testified that he had not invited Powers, T.R., or Dean into his residence on the afternoon of January 4, 2022. Shaw testified that Powers and T.R. appeared in his living room while he and his brother were sitting on the couch. According to Shaw, Powers immediately struck his brother in the face with a firearm when he entered

the living room. Shaw claimed that as Powers struck his brother, T.R. moved toward him with one hand located near his waist. Shaw testified that, in response, he pulled the firearm out of the couch cushion and fired it at T.R. when T.R. got within three feet of him. Shaw then claimed that he stood up and began shooting at Powers, who had returned fire. As a result of the gunfire, Powers was shot and killed and T.R. was shot and left paralyzed from the chest down.

{¶ 13} Shaw claimed that, after shooting Powers and T.R., he helped his injured brother down the stairs to the front door of his residence. From there, Shaw ran out on his front porch and immediately saw Dean fumbling around the center console of his vehicle. Shaw testified that he thought it looked like Dean might have been reaching for a weapon. Based on that observation, and based on his earlier altercation with Dean, Shaw testified that he feared for his safety and fired three gunshots at Dean's vehicle.

{¶ 14} A motion-activated Ring camera that had been installed on the front porch of Shaw's residence recorded a series of short video clips that showed some of the activity that occurred around Shaw's front porch on the afternoon in question. One of the video clips showed Dean running from Shaw's front porch to his vehicle, which was parked right outside Shaw's residence. The next video clip in the series showed Shaw standing on his front porch with a firearm; Shaw raised the firearm in the direction of Dean's vehicle while aggressively shouting: "What you got? What you own n***** ?" State's Ex. 1. Immediately thereafter, Shaw fired his weapon three times in rapid succession at Dean's vehicle, with the third gunshot shattering the passenger-side window. After the window shattered, Dean could be seen on the video exiting from the driver-side door of his vehicle. As he

exited the vehicle, Dean said: "I don't own nothing." *Id.* Thereafter, Dean held up his right arm with his right hand outstretched in a "stop" gesture while his left hand was by the driver-side door. *Id.* The next video clip in the series showed Shaw walking up to his front porch from a grassy area in front of his residence. In a later video clip, Shaw said: "I'm gonna go to jail for the rest of my life." *Id.*

{¶ 15} At trial, Shaw claimed that after he had fired the three gunshots from his front porch, Dean got out of his vehicle, put up his arms, and then ran to the rear of his vehicle while fumbling around with his waistband. Shaw claimed that Dean then side-stepped or galloped toward a house across the street while looking back at him. According to Shaw, Dean was still fumbling with his waistband as he was moving across the street. Upon seeing this, Shaw testified that he went toward Dean's vehicle, stopped at a grassy area between the sidewalk and the street, and then fired his weapon three more times at Dean. Shaw testified that when he fired his weapon, he was still concerned about his safety because of his prior altercation with Dean and because of Dean's fumbling around with his waistband.

{¶ 16} Dean, who was struck by the second round of gunfire, fell in a grassy area between two houses across the street from Shaw's residence and died at the scene. The coroner who examined Dean's body testified that Dean's cause of death was a gunshot wound to the neck and head. More specifically, the coroner testified that a bullet entered the right backside of Dean's neck and exited from the middle of his forehead. The coroner confirmed that the location of the entrance wound indicated that Dean was shot from behind.

{¶ 17} On cross-examination, Shaw admitted that he did not know whether Dean had a weapon when he fired at him. The investigating officers who testified at trial confirmed that no weapons were found on or near Dean's body or in Dean's vehicle. An evidence technician testified that three nine-millimeter shell casings were recovered from the steps of Shaw's front porch and that two nine-millimeter shell casings were recovered from the street near the rear of Dean's vehicle. The officers, however, found no shell casings around Dean's body nor anywhere else outside. A firearm expert who examined the aforementioned shell casings testified that they were all fired from the same weapon, which indicated that only one weapon had been fired outside.

{¶ 18} Although the Ring camera video clips showed that Dean went inside Shaw's residence, Shaw testified that he did not know Dean was inside his residence until after seeing the video clips. The video clips showed that Dean initially meandered on the grass and front porch and did not go inside Shaw's residence until a few moments after Powers and T.R. had already entered. Shaw's testimony indicated that he was not aware of Dean's presence until he went outside on his front porch and saw Dean in his vehicle.

{¶ 19} As previously discussed, Shaw raised the affirmative defense of self-defense at trial and the jury returned not guilty verdicts for all the offenses related to Powers and T.R. and guilty verdicts for all the offenses related to Dean. Accordingly, Shaw was found guilty of the following six counts:

Count 5 – Felonious Assault/Deadly Weapon (gunshots from porch);

Count 6 – Felony Murder via Felonious Assault/Serious Physical Harm;

Count 7 – Felonious Assault/Serious Physical Harm (gunshots from grass);

Count 8 – Felony Murder via Felonious Assault/Deadly Weapon;

Count 9 – Felonious Assault/Deadly Weapon (gunshots from grass); and

Count 12 – Discharge of a Firearm on or Near a Prohibited Premises.

**{¶ 20}** In addition to the foregoing counts, the trial court also found Shaw guilty of having weapons while under disability under Count 14, as there was no dispute that Shaw was under a weapons disability due to having a prior felony drug conviction in Montgomery C.P. No. 2000-CR-642.

**{¶ 21}** At sentencing, the trial court merged Counts 6, 7, 8, and 9, because those counts were all based on the second, fatal round of gunfire that Shaw fired at Dean from the grassy area between the sidewalk and the street. Following the merger of those counts, the State elected to have Shaw sentenced on Count 6, i.e., felony murder via felonious assault/serious physical harm. The trial court imposed an indefinite term of 15 years to life in prison for that count, plus a consecutive three-year prison term for the attendant firearm specification.

**{¶ 22}** Since the felonious assault charged under Count 5 pertained to the first, nonfatal round of gunfire that Shaw fired from his front porch, the trial court found that Count 5 was committed separately from the felonious assaults that formed the basis of Shaw's felony murder conviction. Accordingly, the trial court did not merge Count 5 into the felony murder conviction. Instead, the trial court imposed a separate sentence of three years in prison for that offense, plus a consecutive three-year prison term for the attendant firearm specification.

**{¶ 23}** As for Count 12—discharge of a firearm on or near a prohibited premises—

the trial court also imposed three years in prison plus a consecutive three-year prison term for the attendant firearm specification. For Count 14—having weapons while under disability—the trial court imposed 24 months in prison.

{¶ 24} The trial court ordered the prison sentences for felony murder (Count 6), felonious assault (Count 5), and having weapons while under disability (Count 14) to be served consecutively to one another, and the prison sentence for discharge of a firearm on or near a prohibited premises (Count 12) was ordered to run concurrently to the other sentences. Therefore, when including the firearm-specification sentences, Shaw received a total, aggregate sentence of 26 years to life in prison.

{¶ 25} Shaw now appeals from his convictions, raising four assignments of error for review.

## First Assignment of Error

{¶ 26} Under his first assignment of error, Shaw challenges the jury instructions provided by the trial court. Specifically, Shaw claims that he was prejudiced by the trial court's self-defense instruction because it did not refer to Count 5, i.e., the count of felonious assault that was based on Shaw's firing three gunshots at Dean from his front porch. As a result of that omission, Shaw claims the jury was not instructed on self-defense for Count 5. In addition, Shaw argues that the jury instructions were confusing and lessened the State's burden of proof because, despite there being no self-defense instruction for Count 5, the jury instructions indicated that the presumption of self-defense under R.C. 2901.05(B)(2) applied to Count 5. We disagree with Shaw's claims.

{¶ 27} The record establishes that the parties and the trial court had a lengthy discussion about the self-defense jury instruction and about which counts warranted an instruction on the presumption of self-defense under R.C. 2901.05(B)(2). Pursuant to R.C. 2901.05(B)(2), "a person is presumed to have acted in self-defense . . . when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence . . . occupied by the person using the defensive force." R.C. 2901.05(B)(2). "In order for a defendant to receive the benefit of a jury instruction on the presumption contained in R.C. 2901.05(B)(2), the trial court must focus on the conduct and location of the victim at the time the defendant claims to be acting in self-defense." *State v. Estelle*, 2021-Ohio-2636, ¶ 16 (3d Dist.).

{¶ 28} After a thorough discussion with the parties, the trial court decided that Shaw was entitled to a self-defense jury instruction on Counts 1 through 12, which encompassed all the felonious assault and felony murder counts, and the single count for discharge of a firearm on or near a prohibited premises. The trial court also determined that Counts 1 through 4 and Counts 10 and 11 warranted a jury instruction on the presumption of self-defense because those counts were based on Shaw's shooting Powers and T.R. from inside his residence. The trial court further determined that Count 5 also warranted a jury instruction on the presumption of self-defense because that count was based on Shaw's firing gunshots at Dean from his front porch. In contrast, the trial court determined that the presumption of self-defense did not apply to the other felonious

assault counts related to Dean (Counts 7 and 9) since those counts were based on gunshots that Shaw fired at Dean after running off of his front porch. Shaw objected to that decision.

**{¶ 29}** After making the foregoing decisions, the trial court provided the following self-defense instruction to the jury:

> The Defendant is asserting that he acted in self-defense and so should not be guilty of the offenses at Counts One through Twelve.
>
> A person is allowed to use deadly force in self-defense. It is the State's burden to prove beyond a reasonable doubt that the defendant, when using deadly force, did not act in self-defense.
>
> To prove that the Defendant's use of deadly force was not in self-defense, the State must prove beyond a reasonable doubt at least one of the following: (a) the Defendant was at fault in creating the situation giving rise to the shooting deaths of Marty Powers (Counts One through Four), or ***Darryl Dean (Counts 6 through 9 and Count Twelve)***, or the situation giving rise to the shooting of [T.R.] (Counts Ten and Eleven); or (b) the Defendant did not have reasonable grounds to believe that he was in imminent or immediate danger of death or great bodily harm; or (c) the Defendant did not have an honest belief, even if mistaken, that he was in imminent or immediate danger of death or great bodily harm; or (d) the defendant used unreasonable force.

(Emphasis added.) Court's Ex. III, p. 28; Trial Tr. Vol IV, p. 842.

**{¶ 30}** The bold, italicized portion of the foregoing self-defense instruction establishes that the trial court inadvertently omitted Count 5. Although Shaw objected to the trial court's failure to instruct the jury on the presumption of self-defense for the felonious assaults charged under Counts 7 and 9, Shaw did not object to the omission of Count 5 in the self-defense instruction. Because Shaw did not raise any such objection, he has waived all but plain error for appeal on that matter. *See State v. McAlpin*, 2022-Ohio-1567, ¶ 247, citing Crim.R. 52(B) and *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Therefore, we will review Shaw's argument regarding Count 5 for plain error.

**{¶ 31}** To establish plain error, Shaw "must show that an error occurred, that the error was plain, and that the error affected his substantial rights," i.e., the error "affected the outcome of the trial." *State v. Wilks*, 2018-Ohio-1562, ¶ 52, citing *Barnes* at 27. In the context of affecting a trial outcome, Shaw must " 'demonstrate a reasonable *probability* that the error resulted in prejudice[.]' " (Emphasis in original.) *State v. Thomas*, 2017-Ohio-8011, ¶ 33, quoting *State v. Rogers*, 2015-Ohio-2459, ¶ 22. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91(1978), paragraph three of the syllabus. To determine whether a manifest miscarriage of justice has occurred, we must review the entire record and the jury instructions " 'as a whole.' " *State v. Fletcher*, 2024-Ohio-5117, ¶ 100 (2d Dist.), quoting *State v. Wamsley*, 2008-Ohio-1195, ¶ 17, citing *State v. Adams*, 62 Ohio St.2d 151 (1980), paragraph three of the syllabus.

**{¶ 32}** Viewing the jury instructions as a whole, we do not find that the omission of

the phrase "Count Five" in the self-defense jury instruction amounted to plain error. The jury instructions clearly indicated that Shaw was claiming self-defense for Counts 1 through 12, which necessarily encompassed Count 5. After the omission of Count 5 in the self-defense instruction, the jury instructions stated the following:

> If you find that the State proved beyond a reasonable doubt all of the essential elements of any one or more of the offenses at Counts One through Twelve, and that the State proved beyond a reasonable doubt that the Defendant did not act in self-defense, you must find the Defendant guilty as to those counts.

> If you find that the State failed to prove beyond a reasonable doubt anyone of the essential elements of any one or more of the offenses at Counts One through Twelve, or if you find that the State failed to prove beyond a reasonable doubt that the Defendant did not act in self-defense, you must find the Defendant not guilty as to those counts.

Court's Ex. III, p. 32-33; Trial Tr. Vol. IV, p. 847.

**{¶ 33}** The foregoing language suggested that the self-defense instruction applied to Counts 1 through 12, which, as previously discussed, encompassed Count 5. Also, the fact that the jury instructions stated that the presumption of self-defense applied to Count 5 necessarily suggested that the self-defense instruction applied to that count as well. *See* Court's Ex. III at 29 and Trial Tr., Vol. IV at 843. Therefore, read as a whole, we find that the jury instructions sufficiently indicated that the self-defense instruction applied to Count 5. Accordingly, we fail to see how the omission at issue prejudiced Shaw.

Although the jury instructions were complicated due to the nature of the case, nothing in the record suggests that the jury was unable to appropriately apply the instructions or that any manifest miscarriage of justice resulted from them.

**{¶ 34}** Shaw's first assignment of error is overruled.

**Second Assignment of Error**

**{¶ 35}** Under his second assignment of error, Shaw argues that his convictions for felonious assault with a deadly weapon (Count 5), felony murder via felonious assault/serious physical harm (Count 6), and discharge of a firearm on or near a prohibited premises (Count 12) were against the manifest weight of the evidence.[1] Specifically, Shaw claims that the weight of the evidence established that he was acting in self-defense during those offenses and that the jury lost its way by finding otherwise. We disagree.

*Standard of Review*

**{¶ 36}** "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.), citing *State v.*

---

[1] Although Shaw briefly references the other felonious assault and felony murder counts for which he was found guilty, i.e., Counts 7, 8, and 9, we need not address those counts because they were dispatched through merger. " 'When a trial court dispatches with a count through merger, any error in the jury's verdict on the merged count is rendered harmless beyond a reasonable doubt.' " *State v. Stargell*, 2016-Ohio-5653, ¶ 57 (2d Dist.), quoting *State v. Wolff*, 2009-Ohio-2897, ¶ 70 (7th Dist.), citing *State v. Powell*, 49 Ohio St.3d 255, 263 (1990); a*ccord State v. Gillilan*, 2024-Ohio-4603, ¶ 27 (2d Dist.).

*Hufnagle*, 1996 WL 501470 (2d Dist. Sept. 6, 1996). When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175. "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2014-Ohio-3432, ¶ 24 (2d Dist.), citing *Wilson* at ¶ 14.

{¶ 37} "Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses." *Id.* at ¶ 24, citing *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997). " '[T]he fact finder is free to believe all, part or none of the testimony of each witness appearing before it.' " *State v. Lewis*, 2024-Ohio-756, ¶ 12 (2d Dist.), quoting *State v. Petty*, 2012-Ohio-2989, ¶ 38 (10th Dist.). (Other citation omitted.) " '[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony.' " *State v. Sutherland*, 2022-Ohio-3079, ¶ 47 (2d Dist.), quoting *In re M.J.C.*, 2015-Ohio-820, ¶ 35 (12th Dist.). Therefore, " '[m]ere disagreement over the credibility of witnesses

is not [a] sufficient reason to reverse a judgment.' " *Lewis* at ¶ 12, quoting *Petty* at ¶ 38, citing *State v. Wilson*, 2007-Ohio-2202, ¶ 24. "This court will not substitute its judgment for that of the trier of fac[t] on the issue of witness credibility unless it is patently apparent that the factfinder lost its way." *State v. Bradley*, 1997 WL 691510, *4 (2d Dist. Oct. 24, 1997), citing *State v. Moshos*, 1997 WL 630088 (2d Dist. Oct. 10, 1997).

*Self-Defense*

**{¶ 38}** R.C. 2901.05(B)(1) governs the burden and degree of proof required for the affirmative defense of self-defense and provides that:

A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

**{¶ 39}** The foregoing statute "places the initial burden of producing evidence 'that tends to support' a self-defense claim on the defendant." *State v. Bowen*, 2024-Ohio-1079, ¶ 11 (2d Dist.), quoting R.C. 2901.05(B)(1). " '[I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the

defendant, then the defendant has satisfied the burden.' " *State v. Palmer*, 2024-Ohio-539, ¶ 20, quoting *State v. Messenger*, 2022-Ohio-4562, ¶ 25. "This burden of production is 'not a heavy one and . . . might even be satisfied through the state's own evidence.' " *Id.*, quoting *Messenger* at ¶ 22.

**{¶ 40}** "Once the defendant puts forth sufficient evidence that he was acting in self-defense, the burden then shifts to the State to prove that the defendant did not act in self-defense." *State v. Barker*, 2025-Ohio-56, ¶ 23 (2d Dist.), citing *Bowen* at ¶ 12 and *Messenger* at ¶ 19. To prove that the defendant did not use force in self-defense, "the State must disprove beyond a reasonable doubt at least one of the elements of self-defense." *Bowen* at ¶ 12, citing *State v. Gutierrez*, 2023-Ohio-312, ¶ 72 (11th Dist.). "The elements of self-defense in the use of deadly force are: (1) the defendant was not at fault in creating the situation giving rise to the affray; [and] (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such a danger was in the use of such force." *State v. Tunstall*, 2024-Ohio-2376, ¶ 16 (2d Dist.), citing *State v. Cunningham*, 2023-Ohio-157, ¶ 14 (2d Dist.).

**{¶ 41}** "[T]he second element of self-defense (bona fide belief) ' "requires consideration of the force that was used in relation to the danger the accused believed he was in." ' " *State v. Barker*, 2022-Ohio-3756, ¶ 28 (2d Dist.), quoting *State v. Rothermel*, 2014-Ohio-3168, ¶ 14 (2d Dist.), quoting *State v. Bayes*, 2000 WL 1879101, *4 (2d Dist. Dec. 29, 2000). "It is well established that a person may only use 'that force which is reasonably necessary to repel the attack.' *Id.*, quoting *State v. Paschal*, 2001

WL 395354, *2 (2d Dist. Apr. 20, 2001). "If the force used was so disproportionate that it shows a purpose to injure, self-defense is unavailable." *Id.*, citing *State v. Wallace-Lee*, 2020-Ohio-3681, ¶ 43 (2d Dist.).

{¶ 42} The bona-fide-belief element "is a combined subjective and objective test." *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997). As this court explained in *State v. Wheatley*, 2000 WL 145394 (2d Dist. Feb. 11, 2000):

> The trier-of-fact "first must consider the defendant's situation objectively, that is, whether, considering all of the defendants particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, [he] *reasonably* believed [he] was in imminent danger." [*Thomas* at 330.] "Then, if the objective standard is met, the jury must determine if, subjectively, this particular defendant had an *honest* belief that [he] was in imminent danger." [*Id.* at 331.] Thus, "self defense 'is placed on the grounds of the *bona fides* of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties.' " *Id.*, quoting [*State v. Sheets*, 115 Ohio St. 308, 310 (1926)].

(Emphasis in original.) *Wheatley* at *3.

{¶ 43} In this case, the parties do not dispute that Shaw met the initial burden of production for his self-defense claim. Accordingly, we must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses to determine whether the jury clearly lost its way and created a manifest

miscarriage of justice by finding that the State satisfied its burden to prove that Shaw did not act in self-defense when he committed the offenses under Counts 5, 6, and 12.

*Count 5 - Felonious Assault with a Deadly Weapon*

**{¶ 44}** As previously discussed, Shaw's conviction for felonious assault with a deadly weapon under Count 5 was based on his firing three gunshots at Dean from his front porch. Shaw testified that after shooting Powers and T.R. inside his residence, he went outside on his front porch and immediately saw Dean inside his vehicle fumbling around the center console. Shaw claimed that it looked like Dean might have been reaching for a weapon. Based on that observation, and based on his earlier altercation with Dean, i.e., when Dean threw him on his couch during the theft of his television, Shaw testified that he feared for his safety and fired three gunshots at Dean from his front porch while Dean was in his vehicle.

**{¶ 45}** At trial, Shaw admitted that his fear was primarily based on his earlier altercation with Dean. Shaw also admitted that he did not know whether Dean had a weapon when he fired at him. Shaw further admitted that, at the time he fired his weapon, he was unaware that Dean had been inside his residence. Significantly, the evidence established that Dean had not had a weapon during the shooting or during his earlier altercation with Shaw. We also find it significant that Shaw appeared to be the aggressor in the Ring camera video clip showing Shaw firing the gunshots at Dean from his front porch. Neither the video clip nor Shaw's testimony suggested that Dean had engaged in any violent, threatening conduct when Shaw fired his weapon.

{¶ 46} Because Shaw did not actually see Dean with a weapon and did not see Dean engage in any violent or threatening conduct toward him, and because Dean was not involved in the shooting incident that occurred inside Shaw's residence, the weight of the evidence did not support a conclusion that Shaw had a reasonable, honest belief that he was in imminent danger of death or great bodily harm when he went outside and saw Dean. Although Shaw testified that he feared for his safety upon seeing Dean, the jury was free to discredit that testimony and to rely on the video evidence that showed Shaw as the aggressor. Therefore, the jury did not lose its way or create a manifest miscarriage of justice by finding that Shaw did not act in self-defense when he fired the three gunshots from his front porch. Accordingly, Shaw's conviction for felonious assault with a deadly weapon was not against the manifest weight of the evidence.

*Count 6 - Felony Murder via Felonious Assault/Serious Physical Harm*

{¶ 47} Shaw's conviction for felony murder under Count 6 was predicated on the felonious assault that resulted in serious physical harm to Dean, i.e., Dean's death. As previously discussed, that felonious assault was based on the second round of gunshots that Shaw fired at Dean after running off his front porch. The video evidence established that, after Shaw fired the first three gunshots from his front porch, Dean exited his vehicle, put his right arm up, extended his right hand in a "stop" gesture, and said: "I don't own nothing." State's Ex. 1. Although the video stops at that point in time, Shaw testified that Dean thereafter moved toward the rear of his vehicle while fumbling around with his waistband. Shaw also testified that Dean "sideways step[ped]" or "gallop[ed]" toward a

house across the street while looking back at him and while continuing to fumble with his waistband. Trial Tr. Vol. III, p. 702, 703. At that point, Shaw testified that he moved to a grassy area between the sidewalk and the street and fired three more gunshots at Dean. Shaw acknowledged that the coroner's testimony established that one of those gunshots struck Dean in the back of the neck and killed him. Shaw claimed that when he discharged his firearm, he was still concerned about his safety because of his earlier altercation with Dean and because of Dean's fumbling with his waistband.

{¶ 48} Upon review, we find that the weight of the evidence established that Dean was retreating from Shaw after Shaw fired the three gunshots from his front porch. It also established that Shaw followed Dean and shot him in the back of the neck while Dean was retreating across the street. Although Shaw had no duty to retreat,[2] the jury could have reasonably concluded that Shaw's conduct of leaving his front porch and following Dean, as opposed to returning to his home and waiting for the police, suggested that Shaw did not have a reasonable, honest belief that he was in imminent danger of death or great bodily harm. The lack of such a reasonable, honest belief was also supported by the fact that Shaw shot Dean from behind while Dean was in the midst of retreating. Indeed, there was no evidence indicating that Dean posed any threat to Shaw's safety while Dean was in the midst of running away.

{¶ 49} The evidence also established that Shaw was no longer in danger at the time he decided to follow Dean and fire his weapon, as the shooting incident with Powers

_____

[2] "[A] person has no duty to retreat before using force in self-defense . . . if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09; *State v. Palmer*, 2024-Ohio-539, ¶ 23.

and T.R. had already ended by that time. In addition, the evidence established that Dean had not been involved in the shooting incident with Powers and T.R., had not had a weapon, and had engaged in no violent or threatening conduct toward Shaw.

{¶ 50} For all the foregoing reasons, the evidence suggested that Shaw had gone on the offensive and created the violent situation that led to Dean's death. It also suggested that Shaw did not have a reasonable, honest belief that he was in imminent danger of death or great bodily harm. As a result, we cannot say that the jury lost its way or created a manifest miscarriage of justice by finding that Shaw had not acted in self-defense when he fired the second, fatal round of gunshots at Dean. Accordingly, Dean's conviction for felony murder via felonious assault/serious physical harm was not against the manifest weight of the evidence.

*Count 12 - Discharge of Firearm On or Near a Prohibited Premises*

{¶ 51} Shaw's conviction for discharge of a firearm on or near a prohibited premises was based on the gunshots that Shaw fired from the grassy area while Dean was retreating across the street. Because we have already determined that the weight of the evidence did not support finding that Shaw fired those gunshots in self-defense, his conviction for discharge of a firearm on or near a prohibited premises was also not against the manifest weight of the evidence.

{¶ 52} Shaw's second assignment of error is overruled.

**Third Assignment of Error**

{¶ 53} Under his third assignment of error, Shaw contends that the felonious assaults for which he was found guilty under Counts 5 and 9 were allied offenses of similar import that should have merged at sentencing. As previously discussed, Count 5 was based on Shaw's firing three gunshots at Dean from his front porch, and Count 9 was based on Shaw's firing three gunshots at Dean from a grassy area between the street and the sidewalk. The trial court merged the felonious assault under Count 9 with Count 6 (felony murder via felonious assault/serious physical harm), Count 7 (felonious assault causing serious physical harm), and Count 8 (felony murder via felonious assault/deadly weapon) because all those counts were based on the second, fatal round of gunshots that Shaw fired from the grassy area. Therefore, under his third assignment of error, Shaw is essentially claiming that Count 5, the front porch felonious assault, should have merged with the other aforementioned counts because they were all committed during one continuous act of his shooting at Dean in self-defense. We disagree.

*Standard of Review*

{¶ 54} We review de novo a trial court's determination of whether a defendant's offenses should merge pursuant to R.C. 2941.25. *State v. Williams*, 2012-Ohio-5699, ¶ 1. Therefore, we must " 'independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " *Id.* at ¶ 26, quoting *State v. Burnside*, 2003-Ohio-5372, ¶ 8.

*Allied Offenses*

{¶ 55} When a defendant's conduct supports multiple offenses, sentencing courts apply the allied offense analysis in R.C. 2941.25 to determine whether the offenses merge or whether the defendant may be convicted of separate offenses. R.C. 2941.25 provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 56} " '[W]hen determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions . . . : (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?' " *State v. Earley*, 2015-Ohio-4615, ¶ 12, quoting *State v. Ruff*, 2015-Ohio-995, ¶ 31. " 'An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.' " *Id.*, quoting *Ruff* at ¶ 31.

{¶ 57} Offenses are committed separately within the meaning of R.C. 2941.25(B) if "one offense was complete before the other offense occurred, . . . notwithstanding their

proximity in time and that one [offense] was committed in order to commit the other." *State v. Turner*, 2011-Ohio-6714, ¶ 24 (2d Dist.). In other words, "when one offense is completed prior to the completion of another offense during the defendant's course of conduct, those offenses are separate acts." *State v. Mooty*, 2014-Ohio-733, ¶ 49 (2d Dist.), citing *Turner* at ¶ 24.

{¶ 58} " 'Whether offenses are committed separately often hinges on whether there is a temporal or spatial separateness in the offenses.' " *State v. Fleming*, 2022-Ohio-3158, ¶ 17 (2d Dist.), quoting *State v. Vanausdal*, 2016-Ohio-7735, ¶ 14 (3d Dist.), citing *State v. Skapik*, 2015-Ohio-4404, ¶ 19 (2d Dist.). *Accord State v. Nesser*, 2014-Ohio-1978, ¶ 64 (2d Dist.) ("[o]ur determination often hinges on the timing and location of the offenses"). "A court may conclude that a defendant's offenses involved separate conduct when the defendant breaks 'a temporal continuum started by his initial act.' " *Fleming* at ¶ 17, quoting *State v. Nuh*, 2010-Ohio-4740, ¶ 16 (10th Dist.). " '[E]ven a "slight" temporal separation of the offenses can establish separate offenses.' " *Id.*, quoting *Vanausdal* at ¶ 14. (Other citations omitted.)

{¶ 59} In *State v. Taylor*, 2014-Ohio-3647 (2d Dist.), this court addressed whether a felonious assault and murder were committed separately for the purpose of an allied offense determination. The defendant in *Taylor* fired gunshots at the victim outside of a house, and the victim, who had been shot several times, got up and walked across the street to another address where he fell down. *Id.* at ¶ 13. The defendant thereafter walked over to where the victim had fallen and shot him several more times in the head and upper torso, killing him. *Id.* Evidence from the coroner established that the victim had been killed

by the second round of gunshots that the defendant had fired at the second location. *Id.* Based on these facts, we held that the defendant had committed a separate felonious assault before murdering the victim. We reached this conclusion because the defendant had completed the felonious assault after firing the first nonfatal round of gunshots. *Id.* Because the offenses were committed separately, we held that the trial court correctly determined that they did not merge as allied offenses. *See also State v. Rainer*, 2013-Ohio-963, ¶ 10 (2d Dist.) ("The temporal separation between the knife blows, albeit slight, establishe[d] separate acts of felonious assault.").

{¶ 60} The present case is analogous to *Taylor*. Here, the evidence established that there were two rounds of gunfire that occurred with respect to Dean. The first round, which was nonfatal, occurred when Shaw fired three gunshots at Dean from his front porch. The second round, which was fatal, occurred when Shaw ran off his front porch and fired three gunshots at Dean from a grassy area located between the street and the sidewalk. Shaw completed the offense of felonious assault with a deadly weapon charged under Count 5 when he fired the first, nonfatal round of gunshots from his front porch. Shaw thereafter completed the felonious assault offenses charged under Counts 7 and 9, and the felony murder offenses charged under Counts 6 and 8, when he ran to a new location and fired the second, fatal round of gunshots at Dean.

{¶ 61} Although the two rounds of gunfire occurred close in time, the fact remains that the felonious assault under Count 5 had been completed before the second, fatal round of gunfire began. The second, fatal round of gunfire also took place at a different location. Therefore, the shootings were separate in both time and location. Under these

circumstances, the felonious assault committed under Count 5 did not merge with the felonious assault counts on which Shaw's felony murder conviction was based.

{¶ 62} Shaw's third assignment of error is overruled.

**Fourth Assignment of Error**

{¶ 63} Under his fourth assignment of error, Shaw challenges the trial court's decision to impose consecutive sentences. Specifically, Shaw claims that the trial court erred by imposing consecutive sentences without making the required, statutory findings at the sentencing hearing. Shaw also claims that even if the required statutory findings had been made, the record did not support those findings. We disagree.

{¶ 64} When reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 2016-Ohio-1002, ¶ 7. Under that statute, an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it clearly and convincingly finds either: (1) the record does not support the sentencing court's findings under certain enumerated statutes, including R.C. 2929.14(C)(4), which concerns the imposition of consecutive sentences; or (2) the sentence is otherwise contrary to law. *Id.* at ¶ 9, citing R.C. 2953.08(G)(2). Clear and convincing evidence is that " 'which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *Id.* at ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 65} Generally, where a defendant is ordered to serve a term of imprisonment, there is a presumption that the sentence shall be served concurrently with any other prison term imposed upon the offender. R.C. 2929.41(A). However, R.C. 2929.14(C)(4) provides an exception to allow for consecutive sentences. Under R.C. 2929.14(C)(4), a trial court may impose consecutive sentences if it finds that: (1) consecutive service is necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) one or more of the following three findings are satisfied:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c).

{¶ 66} To impose consecutive sentences, "a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 2014-Ohio-3177, syllabus. "[A] finding in these circumstances means only that 'the [trial] court must note that it engaged in the analysis' and that it 'has considered the statutory criteria and specifie[d] which of the given bases warrants its decision.' " *Id.* at ¶ 26, quoting *State v. Edmonson*, 86 Ohio St.3d 324, 326 (1999). *Accord State v. Jones*, 2024-Ohio-1083, ¶ 14.

{¶ 67} The trial court has no obligation to give a "talismanic incantation" of the words in R.C. 2929.14(C)(4) "provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *Bonnell* at ¶ 37. Therefore, "a word-for-word recitation of the language of the statute is not required." *Id.* at ¶ 29. "[A]s long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.*

{¶ 68} In this case, Shaw concedes that the trial court incorporated all the required consecutive-sentence findings into its judgment entry. Shaw, however, claims that the trial court erred by failing to make those findings during the sentencing hearing and that the findings are not supported by the record. We disagree.

{¶ 69} Prior to imposing Shaw's sentence at the sentencing hearing, the trial court stated that it had "read the presentence report, . . . considered all the seriousness and recidivism factors *and all other relevant sentencing statutes*[.]" (Emphasis added.)

Sentencing Hearing Tr., p. 7. Since the trial court decided to impose consecutive sentences, its statement about considering "all other relevant sentencing statutes" indicates that the trial court considered R.C. 2929.14(C)(4).

{¶ 70} The trial court also made statements indicating that it had engaged in the correct analysis with regard to the first consecutive-sentence finding, i.e., that consecutive sentences were necessary to protect the public from future crime or to punish Shaw. Specifically, the trial court discussed the fact that Shaw had multiple misdemeanor and felony convictions, including two prior convictions for having weapons while under disability. The trial court explained that it had decided to impose consecutive sentences in part due to Shaw's prior weapons-under-disability convictions and suggested that "there wouldn't have been a shooting" without Shaw's illegally obtaining a firearm. *Id.* at 15. The trial court also briefly expressed its concern about Shaw having a firearm while suffering from mental health issues and substance abuse. *Id.* at 7-8. Based on all this information, we can discern that the trial court found a need to protect the public from future crime due to Shaw's ongoing issues with firearms, substance abuse, and his mental health.

{¶ 71} The record of the sentencing hearing also indicates that the trial court engaged in the correct analysis with regard to the second consecutive-sentence finding, i.e., that consecutive sentences were not disproportionate to the seriousness of Shaw's conduct and to the danger that he posed to the public. While discussing its imposition of consecutive sentences at the sentencing hearing, and after acknowledging that Shaw's aggregate prison sentence was a lengthy one, the trial court specifically stated that it had

considered the fact that the incident in question "was extremely serious and had extremely tragic consequences." *Id.* at 15. When considering this statement and the trial court's earlier statement indicating that it had considered all of the relevant sentencing statutes, we can discern that the trial court considered the proportionality of consecutive sentences to the seriousness of Shaw's conduct. The trial court's statements regarding Shaw's various weapons under disability offenses and his mental health issues also suggest that the trial court considered that consecutive sentences were not disproportionate to the danger that Shaw posed to the public.

{¶ 72} The judgment entry indicates that the trial court made the third consecutive-sentence finding under section (c) of R.C. 2929.14(C)(4). Under that section of the statute, the trial court was required to find that Shaw's history of criminal conduct demonstrated that consecutive sentences were necessary to protect the public from future crime by him. In this case, while discussing consecutive sentences at the sentencing hearing, the trial court specifically stated that it "took into account [Shaw's] record, . . . the history, . . . what happened here, and tried to make the best judgment in terms of the sentence in doing so[.]" Sentencing Hearing Tr., p. 15.

{¶ 73} Although the trial court made several statements indicating that Shaw did not have a terrible criminal record, the trial court nevertheless stated that Shaw had misdemeanor convictions for public intoxication, disorderly conduct, and criminal mischief in 2004, resisting arrest in 2010, and domestic violence in 2020. The trial court also stated that Shaw had felony convictions for trafficking cocaine in 2000, possessing a controlled substance in 2009, and having weapons while under disability in 2013 and

2016. The trial court further found that Shaw had a capias out of Michigan from 1996 for failing to appear for a charge of carrying a concealed weapon. In addition, the trial court stated that Shaw had "a good number of substance abuse related offenses." *Id.* at ¶ 8. Based on the foregoing information and the trial court's statements indicating that it had considered Shaw's criminal history and all of the relevant sentencing statutes, and based on the trial court's decision to impose consecutive sentences, we can discern that the trial court found that Shaw's history of criminal conduct demonstrated that consecutive sentences were necessary to protect the public from future crime by him.

**{¶ 74}** For all the foregoing reasons, we find that the record of the sentencing hearing sufficiently demonstrates that the trial court engaged in the correct analysis under R.C. 2929.14(C)(4) and thus made the required consecutive-sentence findings. In addition, we do not clearly and convincingly find that the record does not support those findings. Accordingly, the trial court's imposition of consecutive sentences was not contrary to law.

**{¶ 75}** Shaw's fourth assignment of error is overruled.

## Conclusion

**{¶ 76}** Having overruled all four of Shaw's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and WELBAUM, J., concur.